Number 20-2139 Eastern Arkansas, Mary Lane v. Mack Ball, Jr. at all. Ms. Campbell, good morning. I think you're, I think you need to unmute. I'm still not hearing you. You're on. Ms. Campbell, hit it again. Now, you're on. You're hitting it too many times. Just one hit. You're unmuted. Now, you should be able to speak. Good morning, Your Honors. May it please the court. I'm Sheila Campbell. And I represent the appellant, Mary Lane, in this case. Ms. Lane brings this claim for discrimination under Title VII, based upon discrimination based upon her race. And she also brings a claim for discrimination based upon her conditions that she developed as a result of her cancer under the ADA. Ms. Lane's position with the County of Chico was that of a GIS 9-11 and solid waste coordinator. 80% of her job was doing billing and setting up accounts for the wastewater billing in the county where she resided. She became employed in that position in September of 2014 and subsequently developed breast cancer in August of 2016. After she developed the breast cancer in August of 2016, she had some complications as a result of the chemotherapy that she was undergoing. It is her contention that as a result of these complications that she was undergoing for her cancer, she met with the county judge Ball to seek to be able to either work part-time from home or to come in in the evenings and work after hours because her immune system had been affected by her cancer and she needed to avoid being around a crowd of people because she was susceptible to contracting other types of illnesses. That may be a reasonable thing to ask in light of her condition, but I'm kind of wondering whether it gets to her qualifications, which is it seems undisputed that her job included some a lot of interaction with the public and if you can't interact in the public with the public in the evening, if it's an office setting and so I'm wondering if that undermines the arguments on the prima facie case. Your Honor, I don't believe it undermines the argument on the prima facie case because 80% of her job was not interacting with the public and her counterpart who is a Caucasian female, Mary Huff, negotiated being able to stay at home and take care of her elderly parents and work for the county as well. But she was hired on that basis, right? With that understanding. And I believe there is where the implicit bias is in this case. Well, when did your client had worked for how long before she requested this accommodation? Two years. Well, if she had been hired with the same understanding, that was part of Ms. Huff's job description. If she was hired with that understanding, they're just not comparable. Your Honor, in due respect, I believe that it sets up a color where an African-American employee sees another employee whose job was changed because in the affidavit, Ms. Lane says that she was performing the jobs that Ms. Huff would have performed if they would have required her to come to work. She was taking complaints from the city department, which was not her job duties, but because Ms. Huff was not at work during the day, she was doing part of her job. No, she was not. Now, wait a minute. Not if that wasn't part of Ms. Huff's job. It was part of Ms. Huff's job, according to- No, not if she was hired with the understanding she'd work at home. It was not. You can say that in theory that another person who would have been hired without that understanding would have done more at the office, but it was not part of Ms. Huff's job if she was hired with that understanding. And Ms. Lane, to the extent she, I mean, that was part of her job was to do, was to do the part of Ms. Huff's job that would, that Ms. Huff, do the things that Ms. Huff would have been, would have done if she had been hired to come in the office. It's just no comparability whatsoever and race is irrelevant to that lack of comparability. Well, Your Honor, with due respect, I think it sets up a color line. It sets up giving this- Okay, what's another, give me another example, another example in the record of this color line. Because this African-American employee comes to work and she sees that she is taking the job duties of this other Caucasian employee,  the complaints that she receives from the road department, the complaints that she receives about the drainage to Ms- Counsel, that doesn't answer my, I asked you to give me another example in the record of this color line in this office. You say this is an obvious color line because Ms. Lane is black and Ms. Huff is white. You say that means it's a color line. Well, color lines aren't proved by a single incident. We've got multiple cases to that effect. Do you have another example in the record? Well, the example in the record is that Ms. Lane's health should have been just as important as Ms. Huff's parents' health, for which the county allowed her to stay at home and take care of her parents. Secondly, the judge, when Ms. Lane asked to be able to either come in in the evenings, as Ms. Huff, to work, she was told that her time could not be tracked. Well, if he had a mechanism for tracking Ms. Huff's time, that should have been a mechanism for tracking Ms. Lane's time. Ms. Gamble, back to your argument about the percentage of time spent. What percentage of her time was devoted to working with the public? Well, 80% of her time was working on the computer. So I would... Okay. So that would have been, what, 20% at most? At most, Your Honor. But during the time that she was taking chemotherapy, there was an individual that was hired part-time that Ms. Lane trained to do part of the work, to take the complaints and be there during the time that she wasn't there. So that information could have been communicated to her at home to make whatever corrections in the bill. There had already been some accommodations for the fact that she was not going to be at work full-time when they hired the part-time individual for which Ms. Lane said she came in and trained the lady on taking the complaints, on doing the part of the 911 addresses for the different citizens that would come in and have those type of complaints. So just as the information could have been taken by Ms. Dunbar and then transmitted to Ms. Lane, and she could have done the computer work. So the fact that the judge had already hired somebody part-time to accommodate Ms. Lane in either coming in and working part-time in the evening so that she did not have to subject herself to a lot of people and put her immune system at risk or allow her to do the billing at home because she already had it set up on a computer every night. She backed up all of these accounting records for the billing on her computer and she already had the information on the laptop for which she could work all of the billing from home. Counselor, I have a couple of questions. My first question is, is there anything factually in the record on how much time Ms. Huff interacted with the public? She had a different job description. She was the administrative assistant to Judge Ball and that's very different, I think, at least in theory, than Ms. Lane's job. So do we have anything about Ms. Huff and what percentage she had interact with the public? No, because Ms. Lane was there interacting with the public for her and communicating the information to her at home. Okay, and I just wanted to ask one follow-up question. I saw in your, you know, I think a lot of this case is about, and you mentioned this during your oral argument, implicit bias. And I guess my question is, is implicit bias actionable? I mean, what Title VII requires is some evidence of bias. And so I don't think it's enough for us to say, you know, one employee was black, one was white, there were different rules and therefore it must reflect discrimination. I want to give you a chance to respond to that because so much of your brief was focused on that. Well, yes, Your Honor, I think so. When Ms. Lane, on February the 13th of 2017, went to Judge Ball's office, he gave her a letter. And in the letter, it states that he wanted to know something about whether she would be working full-time or part-time. And it is her contention that in this conversation on February the 13th, she engaged with him as to allowing her to work part-time, either coming in in the evenings or working from home. He had to ask the forum court to approve that. But in his deposition that I took, he said no, he did not tell her that, that it was up to him how he structured the jobs in his office. However, when I asked him, did you seriously ever consider allowing Ms. Lane to work from home? He specifically said no, he never considered allowing her to work from home. So while he may have pretended like he was listening to her, he never took into consideration her disabilities. He never took into consideration whether he could actually accommodate this lady because he said he never considered it at all. Anything that she was saying to him, he, while he made lip service that I will work with you in any way I can, in fact, he never intended to work with her. So I think, I think Judge, Judge Ball would say, and I think they have said, is that the reason was that she interacts with the public and I think that's a legitimate non-discriminatory reason potentially. And then the evidence is, or then the question is, what is there, what evidence of pretext do we have? The pretext, Your Honor, is the fact that he said that he would work with her and allow her to work from home. Well, how could you work with her? Well, he will work with her and allow her to work part-time when he never considered that. To me, that's pretext. I don't know how you would get anything else but pretext. If somebody told me, oh, I will work with you, you can work from home, and then say they never considered it. Well, then the whole conversation she had with him was for, no. Why didn't he just tell her, no, you can't work, you know, you can't either work in the evenings or you can't work from home. She had two different suggestions. I'll come in in the evenings and work or I'll work from home. And then he hired somebody part-time to interact with the public in the daytime. So, under the ADA, he should have been able to modify that job in order to allow her to be able to maintain her employment, since he said he was going to allow her to work part-time. When he gave the letter on February 13th, why give me a letter asking whether I'm going to come back to work part-time when you never intended to allow me to do this? So, to me, that's a question, that's a fact question for a jury as to the credibility of these two individuals who were the only two people in their room that day. Did Ms. Lane respond to the letter? Yes, she was sitting in his office and she responded. You say the letter's in writing. I haven't seen it. I don't even know if it's in the record. But if it's in the record, did she respond in writing to it, including with a request for ADA accommodation? Your Honor, the letter was handed to her while she was sitting in Judge Ball's office, and she responded to it because when he handed it to her, they were sitting face-to-face. So, she didn't feel like she... Wait, wait, wait. Is the letter in the record? Yes. All right, we'll find it. We'll find it. That's all right. But how, if the response was oral, what was it? Are you, I gather you say, you describe it as asking whether she's going to work full-time or part-time. What was her answer? Well, she asked him if she could come in and work part-time. Either in the afternoon or remotely from home. And that's what occurred. I know. All right. You're, well, you're, you're, go ahead. Yeah, go ahead. I'm finishing. All right. Well, we'll find, we'll find the letter and any response there was. Thank you. Mr. Owens. Thank you, Your Honor. May it please the Court. My name is Jason Owens. I'm a lawyer in Conway, Arkansas. I represent Chico County in this case. The district court held, and the county certainly believes correctly held, that Ms. Lane failed to meet her burden of creating a genuine disputed material factor with respect to either her disability or racial discrimination claims. I'll begin with her disability discrimination claims because I think those claims shed some light on the other. Counsel, I have a, I have a quick question. It's amazing to me. We have two briefs that can't, can't agree on when Ms. Lane's FMLE leave expired. You say, you say on March 24, plaintiff's counsel says it was, there was still time available when she, when she was terminated and then gets the termination date wrong. So where in the record do we go to figure out what, what the, what the record is on that? Well, we, we made the statement in our statement of facts and Ms. Lane did not, in support of our summary judgment motion, Ms. Lane did not dispute that statement. So there's no, there's no supporting a documentary or other employee record evidence supporting one way or another? Well, the 24th of March was the end of the 12th week of the year. She missed, without dispute, missed all 12 weeks of that year. County policy holds that FMLE leave runs concurrent with all other leave. It's, well, I know from this FMLE timing can be very, very complicated. I'm just, you know, are there, are there employee records or human resources department records that we have as part of the summary judgment record that we can go? Your response that it was in your, it was not disputed and it was in your statement of facts can, can be sufficient. Then I asked you, is that all there is? And, um, you know, I, well, you, you give me something that would require documentary support. I think that it is all there is. And the reason for that, you can certainly have to agree with the court that it is sufficient, particularly under local rule 56.1C of the Eastern District Court of Arkansas, which says that statements of fact not disputed are deemed admitted. Um, but, uh, I think the reason that there isn't more documentary evidence is that, uh, Ms. Lane never submitted her portion of the FMLE paperwork, uh, given to her early in the year in 2017 and she never returned it. Never. Um, the, um, uh, she was terminated on April by, by letter on April 5, um, pointing to the fact that she had failed to come to work, uh, through that date, in fact, never reported to work or, or called. Um, it wasn't until eight days later than any information was received. Uh, and that was from, uh, a physician, um, that purported to have treated Ms. Lane and said that she... Okay. Well, that was supposed to be just a quick question. Yeah. Yes, Your Honor. That, that, that letter is important because ultimately on April the 13th, the physician says that she was cleared to work as of March 16th. Um, eight days before her FMLE would have run out and she didn't return, has never offered any explanation as to why she didn't return. Um, and this is the point on the first issue of a disability discrimination claim, whether she was disabled or even perceived to be disabled. Um, and, and the answer to that is she clearly was not. Um, there, there is at least, at least as the documentation went, and I'm speaking to contemporaneous perception, of course, on the back end, she testifies at her social security disability hearing a year later that she was profoundly disabled such that she only, uh, awoke and, and moved about for 20 to 30 minutes per day. Um, but, but as far as that she would be receiving, uh, intermittent chemotherapy treatments. The doctor's notes indicated that those treatments would affect her on the day of the treatment and perhaps a day or two afterwards. Um, yet during the entirety of the treatment, uh, long suspensions of this treatment, Ms. Lane did not report to work. Um, a note was received from her doctor that her treatment in the fall of 2016, that her treatments were to be suspended, uh, and restarted January the 24th. Counsel, I'm getting an awful lot of background noise and having trouble. I don't know what's going on where you are. Sounds like a, sounds like a construction zone. No, nothing here. Your honor. Okay. Now that whatever you did, whatever you did solved it. Thank you. Okay. Um, the, the second point of course, is whether she's able to perform with or without reasonable accommodation, the essential functions of the job or social security disability hearing testimony, uh, absolutely refutes that point. Um, again, she testified under oath in a hearing in March of 2018 that she was profoundly disabled, uh, completely unable to, to even get up out of her bed. Uh, she said she, she got up for only about 30 minutes per day and was only able to sit for about five or 10 minutes of that. Um, that's not a person who can perform the essential functions of a full-time job, particularly one that requires contact with the public. Um, additionally on that, on that point, what's the relevance of the testimony? So as I recall, the district court relied on it pretty heavily. Um, but you know, the Supreme court's also been pretty clear, um, that you're not prevented from, from seeking an ADA claim or, or pursuing an ADA claim, even if you've been found totally and permanently disabled by the social security administration. Um, so is it more of the substance of the testimony that you would rely on here? Or is it the fact that, you know, another fact finder found her totally disabled? Yes, Your Honor. The Ms. Lane, uh, tries to thread the needle that, that the Supreme court has allowed for, which is just as the court described it, that you can get social security disability, but still not being, uh, so disabled, uh, as to render you unable to perform the essential functions of your job. Um, that would be where the social security administration makes a bare finding here. The Ms. Lane gave sworn testimony. And of course, this court's precedents, we cited them in a briefing, Canfield and others, um, say that, uh, where you contradict your own previous sworn testimony to avoid summary judgment, that's impermissible. No reasonable juror could be expected to believe that you were able to perform all this remote work, uh, evening work, part-time work that Ms. Lane is now saying she was ready and willing and able to perform. When in a social security disability hearing a year after her termination, she said throughout the pendency of this time, she was profoundly unable to work. Entirely unable to work. So it is the substance of that sworn testimony. No reasonable juror could be expected to believe, um, this post hoc revision testimony in light of her previous sworn testimony at this hearing. So while, while there is a needle that can be threaded with respect to social security disability, uh, determinations, uh, it can't be where the testimony is under oath and is this strong that, that she was unable to perform any functions of her job. Um, Ms. Lane also, uh, failed to show that, um, uh, disability had anything to do with the, the termination as opposed to her, uh, failure to meet the legitimate expectations of her employer. Um, and certainly can't show that, that that was pretextual. Um, in fact, in her sworn testimony at that social security hearing, she says that Judge Ball bent over backwards, uh, to assist her. She said that, that, uh, for long periods of time, she wasn't there. Um, another point on the FMLA leave is I'm not sure the record is even clear that she was entitled to FMLA leave in 2017 because there's, there's, uh, evidence, um, a plenty that, um, she failed to work for long periods in 2016 and certainly no evidence that would establish that she worked 1,250 hours as a, as a prerequisite for FMLA, uh, entitlement. But, um, she said in her disability, uh, testimony that he was quote generous in his giving to try to help that he paid her, even though she wasn't there. These are quotes from her deposition testimony. She described these payments as gifts and as gift money. Um, even though she wasn't working, they gave her a check as if she had worked. Um, this is not evidence of somebody that was discriminating. This is evidence of somebody who was providing every accommodation possible. No, no direct or indirect evidence of disability discrimination was offered by Ms. Lane. Uh, no evidence of pretext with respect to these legitimate non-discriminatory reasons was offered. Um, thus the county would assert that the district court's dismissal of the disability discrimination claim was proper and should be affirmed. Uh, likewise, with respect to the racial discrimination claim, uh, while Ms. Lane is certainly a member of protected class, she can't show that she was meeting her employer's legitimate expectations of, uh, of her. Um, of course the most and most fundamental legitimate expectation of an employee is that they come to work. Um, not only did Ms. Lane bail in that respect, she failed to keep in touch with, um, her boss. Um, and in fact, Judge Ball testified, and this wasn't directly rebutted, that, uh, she appeared to be affirmatively avoiding him. Uh, he couldn't ever get in touch with her. Uh, she missed large swaths of time, even though the notes from her doctor indicated that she, uh, only needed intermittently when these treatments occurred and the short period thereafter. Um, and yet he couldn't get in touch with her. Uh, his testimony was despite repeated attempts, even going to her house. Um, the, um, uh, Ms. Lane can also, uh, not prove, uh, uh, facts that give rise to an inference of discrimination. She offers no direct evidence of discrimination. In fact, um, the evidence on that point cuts against her claim. The undisputed proof in the record is that the majority of Judge Ball's employees were African-American, that she was replaced by an African-American employee, uh, neither of which would support a claim of discrimination. Um, but also the only evidence that she offers even indirectly is this comparison with Ms. Huff, the, uh, secretary, Judge Ball's secretary, who as a, as a, uh, uh, component of her initial employment agreement, in other words, she couldn't come to work unless she was allowed to work there. And thus her job description, uh, was that she would work from home and um, there's no evidence that she had any function with respect to, uh, the public, um, even Ms. Lane's post hoc allegations that she performed some of Ms. Huff's job duties were all job duties that didn't relate to, uh, dealing with the public. In other words, this was, um, uh, an improper comparison, at least not, not a similar enough comparison to create an inference of discrimination. This court has held repeatedly as Judge Loken pointed out that, um, more than a singular instance or comparison is necessary and that rigorous, uh, uh, standards of similarity are required to create an inference of discrimination that simply doesn't exist here. Um, the Ms. Lane's brief, um, went into some detail about, um, without citation, of course, because there are no cases on these points, but in some detail about white privilege and inherent bias and some of those notions, um, those run contrary to Title VII, which requires proof of discrimination. Um, and of course the county would, would oppose those notions on that basis. Um, for these reasons, um, the county, uh, would assert that the, uh, district court's dismissal of the racial discrimination claim was likewise proper and should be applied. Let's see. I've got a minute or so left, but the court has no further questions out of you. Thank you, Mr. Heller. Ms. Campbell, uh, you've used your time and I think we understand the issues, but I'll give you a minute for rebuttal if you'd like it. You need to, you're muted. Uh, the court had asked about the February 13th letter and that's at APP 316 and in that letter it says, I cannot schedule appropriate personnel unless you communicate, uh, an anticipated time frame as to when you will return to work either part-time or full-time. And this letter was given to Ms. Lane while she was sitting in the county judge's office. That is when she discussed with him wanting to come back to work, uh, part time, either in the evenings after hours or working remotely from home. And, uh, finally regarding her social security claim, she was found disabled under the closely approaching old age standard under social security, which says that, uh, she could do sedentary work and not that she was totally disabled from our work. Thank you. Thank you, counsel. The case has been well briefed and argued and we will take it under advisement.